**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANNE M.,[1] | ) | |
| | ) | |
|        **Plaintiff,** | ) | No. 20 C 6053 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
|        **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§416(I), 423, 1381a, 1382c, five years ago in March of 2017. (Administrative Record (R.) 349-61). She claimed that she had been disabled since 2011, due to neuropathy in her legs and feet, migraine headaches, and liver scarring. (R. 396). Over the next three and a half years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on October 9, 2020. The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on October 22, 2020 [Dkt. #6], and the case was finally fully brief in September 2021. [Dkt. #24]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff will be listed using only the first name and the first initial of the last name.

**I.**

**A.**

Plaintiff was born on May 9, 1957, making her 62 years old when the ALJ found her not disabled. (R. 15-28, 168). She has a masters degree in Liberal Studies and for the great majority of her working life worked at the CTA in various positions until 2011. (R. 415). These were office jobs ranging from human resources to routing customers during construction projects. (R. 47-48, 419-21). Plaintiff testified that, in 2011, she was terminated due to excessive absenteeism due to stress and depression. (R. 44). The stress and depression were the result of the nature of the work; it was very boring. (R. 47). She had part-time jobs after that, and did look for other work. But, she stopped her job search in 2017 on advice of counsel due to her application for disability. (R. 45).

Plaintiff testified she can no longer work because of numbness in her feet and arthritis in her hands and knees. She claims she has to alternate sitting and standing every 20 minutes. (R. 55). She is a recovering alcoholic and has not drank since 2016. (R. 55).

The medical record in this case is massive, over 2300 pages in length. (R. 515-2829). Despite two 60-day extensions of time in which to file the record, it is a disorganized mess. Records go from 2015 to 2011, to 2017, to 2016, back to 2017, and so on through those 2300 pages. Many of the entries are duplicates of other entries, making it even more of a challenge to sift through. As it turns out – and as is generally the case – very little of it has much to do with whether the plaintiff can work or not. Indeed, plaintiff directs the court to just 30 pages of those 2300 pages of medical evidence as support for her claim for benefits. [Dkt. #17, at 2-5 (citing R. 566, 569, 573, 575, 581-84, 784, 1032, 1034, 1123, 1258, 1636-37, 1647, 1649-53, 1656-57, 1660, 1699, 1705, 2036, 2065, 2084-85). Overall, the medical evidence does little to suggest plaintiff cannot perform sedentary

work, which is what the ALJ concluded. Clinical studies, in the main, demonstrate that plaintiff's impairments are mild. Examinations, in terms of strength, reflexes, coordination, and sensation, are almost always normal.

On October 27, 2014, plaintiff sought treatment from Dr. Samuel Granieria after hurting her knee climbing some stairs. (R. 566). Her pain had improved and she had a full range of motion in both knees. (R. 566, 568). Exam was essentially negative with the exception of some tenderness in the right hamstring. (R. 566-67). Dr. Granieri noted that plaintiff had not been to his office since 2011, but that she reported she had been seeing another doctor for anxiety and depression. (R. 566). She was anxious about job search but stable. (R. 566). Dr. Granieri noted plaintiff's affect to be normal and no signs of depression. (R. 567, 568). Dr. Granieri also noted a history of migraines for which plaintiff occasionally had to take Maxalt "with stable pattern and good response." (R. 567).

On February 2015, she again sought treatment for right knee pain, this time from Dr. John Glynn. Plaintiff also reported soreness in her right thumb, ongoing anxiety and depression, for which she was taking medication, and tingling in her feet since 2011, and migraines under control. (R. 569, 571). She told the doctor she drank alcohol every day. (R. 569). Physical exam was normal with the exception of positive ant drawers, medial and lateral joint laxity, and McMurray's sign. There was no effusion or decreased range of motion. (R. 571).

On March 19, 2015, the exam was essentially the same. Dr. Glynn noted an MRI had revealed a meniscus tear in the right knee. (R. 573). Dr. Glynn recommended plaintiff treat her alcoholism first and then possibly undergo knee surgery. (R. 575). The March 30, 2015 exam was again the same. (R. 575). Plaintiff reported she was no longer seeing her doctor for depression. (R.

3

574). Little or nothing changed through visits in April and June. (R. 578, 580).

On June 29, 2015, plaintiff saw physician's assistant Joseph Boutet for continuing right knee pain. (R. 581). She reported a history of slight high blood pressure and anxiety and depression. (R. 581). Examination of her lower extremities revealed tenderness to palpation in the right knee, but no effusion, good range of motion, and no exacerbation with McMurray's testing. (R. 581). She was diagnosed with chondromalacia and anterior horn lateral meniscus tear, and while it was noted that liver enzyme issues would preclude any surgical intervention, she was not a candidate for surgery anyway. Instead, physical therapy was prescribed. (R. 582).

On May 12, 2016, plaintiff returned and reported that her right knee was only giving her a "little bit of trouble." (R. 582). Gait was normal, range of motion was normal, strength was only slightly reduced. Patella was still somewhat tender to palpation. (R. 582-83). She needed to lose weight and continue physical therapy; no surgery was indicated. (R. 583).

On June 3, 2016, Dr. Glynn referred plaintiff who presented to Dr. Josh Levitsky for evaluation of elevated liver enzymes. (R. 583). Dr. Levitsky noted possible advanced fibrosis or cirrhosis, and suggested further imaging. (R. 583-84). Plaintiff reported drinking two bottles of wine a week, but had drank heavily up until 2010. (R. 584). They discussed the hazards of alcohol and the need to seek counseling, which she said she attempted but without success because of insurance issues. (R. 584). Plaintiff was back to see Dr. Glynn on June 8, 2016, and he reported that her knee had been improving with physical therapy. (R. 584).

On August 31, 2016, Plaintiff sought treatment for tingling from her feet to her ankles that she had experienced for six years, worse at night. (R. 1032). It was noted that she was a recovering alcoholic, and that she had migraines since high school that were controlled with medication. (R.

4

1032, 1033). She denied any joint pain. (R. 1032). Strength, reflexes, and gait were normal. (R. 1034). She was diagnosed with distal lower extremity paresthesias, possibly polyneuropathy with the risk factor of alcoholism. (R. 1034). As of October 6, 2016, plaintiff had, by and large, stopped drinking, and liver studies had improved significantly. (R. 1100). Musculoskeletal and neurological exams were normal. (R. 1100). On December 29, 2016, a neurology note indicated that plaintiff experienced neuropathy symptoms (tingling) in her feet, lower legs, and hands, and that Gabapentin was not helping so far. (R. 1123). At that time, she was no seeing a mental healthcare provider, but was still taking medication for anxiety and depression. (R. 1123). It was also noted that she had an abrupt onset of nausea, with lethargy, mental fog, headache, word finding difficulties, and unsteadiness. (R. 1123). Physical exam was normal. (R. 1125). Diagnosis was dehydration due to food poisoning. (R. 1125, 1177). She was treated with antibiotics and fluids. (R. 1191).

As of January 16, 2017, plaintiff was improved, but numbness and tingling in her feet – most likely alcoholic neuropathy – continued. She was using a cane when outside. (R. 1135, 1144). Vitamin supplements and exercises were prescribed. (R. 1137). A week later, she fell while brushing her hair. She bruised her right knee, hip, and shoulder, but was able to go out to dinner. (R.1155). Her knee was stiff, but there was no swelling. (R. 1155). By February 3, she had no joint or muscle pain and denied any depression or anxiety. (R. 1179). Examination was grossly normal throughout. (R. 1179). On February 20, 2021, physical examination was again essentially normal, with full range of motion in right shoulder and hip. The exception was some crepitus and swelling in the right knee. (R. 1194). Examination was normal again on February 24, 2021, including strength, sensation, reflexes, and coordination. Gait was normal aside from some difficulty with tandem walking. (R. 1204). Plaintiff had a normal brain scan on March 13, 2021. (R. 1220).

On July 3, 2017, plaintiff reported pain in both knees, along with the same numbness in her feet. (R. 1242). Exam was normal; full range of motion in the right hip, right shoulder, and left knee. The only exception was some crepitus, swelling, and decreased range of motion in the right knee. (R. 1243). X-rays of plaintiff's knees on July 31, 2017, showed moderate patellofemoral joint space narrowing with small osteophyte formation, with greater arthritic change in the left knee. Diagnosis was early degenerative joint disease. (R. 1660). Physical therapy was prescribed again, and plaintiff was started on naproxen. (R. 1660). On August 21, 2017, plaintiff was still suffering from foot paresthesias, worse at night. (R. 1656-1657). Neurological exam – strength, sensation, coordination, reflexes – was normal. (R. 1656). Small fiber neuropathy was suspected, a skin biopsy was scheduled, and her nighttime dosage of gabapentin was increased. (R. 1657). The skin biopsy was positive for small fiber neuropathy in the lower extremities. (R. 1657). Physical therapy was prescribed. (R. 1657).

On August 25, 2017, plaintiff complained of occasional hand pain, worse on the right (her dominant hand). (R. 1650-51). X-rays of the right hand revealed minimal joint arthritis of the PCP joint. (R. 1652-53). Imaging of the left hand revealed mild joint space narrowing at the base of the thumb CMC joint. (R. 1653). She was fitted for a right thumb based hand splint. (R. 1647, 1652).

In September 2017, a right knee x-ray revealed mild degenerative changes with mild osteophyte formation. (R. 1258). Examination on September 26, 2017, was again normal with the exception of some crepitus, swelling, and decreased range of motion in the right knee. (R. 1636). On July 11, 2018, plaintiff reported that she continued to use the splints for her right thumb, and noted that her symptoms were worse in the morning. (R. 2036). Symptoms in the right hand were mild; left hand was relatively asymptomatic. (R. 2036). But, she was given a cortisone shot for a

6

left index trigger finger. (R. 2036). On July 31, 2018, examination was normal, including strength, sensation, coordination, and reflexes. Gait was normal with the exception of some difficulty with tandem walking. (R. 2051).

On April 11, 2019, plaintiff complained of bilateral knee pain, noting that the right knee was worse with pain radiating down the tibia. (R. 2084). She reported that she had stopped physical therapy due to coronary bypass surgery and had to stop taking naproxen due to heart medications. (R. 2084). Physical examination revealed swelling in the right knee, but 120 degrees of motion, slight decrease in strength, and negative McMurray's sign. (R. 2084). X-rays of the right knee showed mild to moderate joint space narrowing and some increase in osteophyte formation. (R. 2084). Plaintiff was given a cortisone injection into the right knee, and instructed to resume physical therapy. (R. 2085). On June 10, 2019, range of motion in the knee was good. (R. 2062). Plaintiff had developed low back pain. (R. 2062). Straight leg raising was negative. (R. 2064). Strength, reflexes, sensation coordination, and gait were all normal. (R. 2064). On July 8. 2019, it was noted that plaintiff's small fiber neuropathy was objectively stable, and Gabapentin was working well. (R. 2058). Plaintiff had developed neuropathic symptoms predominantly of the right lateral foot and at night. (R. 2065).

On February 20, 2017, Dr. John Glynn, plaintiff's treating internist, completed a physical residual functional capacity questionnaire from plaintiff's counsel. (R. 1273-1276). Dr. Glynn had been treating Plaintiff for 15 years and noted diagnoses of right knee meniscal tear, osteoarthritis of the right knee, peripheral neuropathy, hepatic cirrhosis, tumor of the left ureter, and migraine headaches. (R. 1273). He noted symptoms of chronic knee pain, foot numbness and tingling, and headaches. (R. 1273). There were no psychological conditions affecting plaintiff. (R. 1273). The

7

doctor reported that plaintiff's prognosis was poor. (R. 1273). Dr. Glynn thought that plaintiff's pain was severe enough to constantly interfere with the attention and concentration needed to perform even simple tasks. (R. 1274). He felt that she could sit for 45 minutes at a time, and stand for 20 minutes at a time, and stand/walk or sit for a total of less than two hours per day. (R. 1274). The doctor added that she would need a ten-minute break every two hours. (R. 1275). But he also thought she could perform a moderate stress job. (R. 1274). He said that she would need to shift positions at will, and would need to take unscheduled breaks for ten minutes every two hours. (R. 1274). She had not limitations using her hands. (R. 1276). He noted that plaintiff requires a cane. (R. 1275).

On March 26, 2017, Dr. Glynn wrote a letter in which he reported diagnoses of hepatic cirrhosis, migraine headaches, peripheral polyneuropathy, right knee meniscal tear, chronic right knee pain, and hypertension. Dr. Glynn wrote that plaintiff has impaired mobility to the right knee condition and peripheral neuropathy. He wrote that she experiences constant painful numbness in both feet and ankles, and chronic pain and instability in the right knee. He wrote that she ambulates with a cane, and has fallen. Dr. Glynn opined that plaintiff has disabling impairments that limit her ability to stand, walk, lift, and carry, and that she can sit but has difficulty getting up. He stated Plaintiff can handle objects, hear, and speak. Contrary to the form he filled out a month earlier, Dr. Glynn reported that plaintiff's prognosis was fair. (R. 928).

**B.**

After two administrative hearing at which plaintiff, represented by counsel, testified, along with two different medical experts and two different vocational experts, the ALJ determined the plaintiff had no impairments prior to October 27, 2014; thereafter, the ALJ found the plaintiff had

the following severe impairments: "osteoarthritis of the knees and torn meniscus; small fiber neuropathy of the lower extremities, likely alcohol induced; and bilateral osteoarthritis of the first carpometacarpal ("CMC") joint, right worse than the left side." (R. 18-19). The ALJ also considered several other impairments he found non-severe: right thumb nodule, alcohol abuse, liver cirrhosis, migraines, coronary artery disease with stenting, hearing loss and glaucoma. (R. 19-20). The ALJ then found plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, focusing on Listings 1.02A (osteoarthritis of the knees), 1.02B (osteoarthritis of the first carpo-metacarpal joint), and 11.14 (lower extremity neuropathy). (R. 21).

The ALJ then determined that plaintiff could perform sedentary work with the following limitations:

> [S]he cannot climb ladders, ropes, or scaffolds. She can occasionally can climb ramps or stairs and occasionally balance and stoop. She cannot crouch, kneel, or crawl. She requires the use of a handheld assistive device for ambulation and balance. She can frequently handle and finger bilaterally. She must avoid all exposure to use of dangerous, moving machinery and unprotected heights.

(R. 22). In addition, the ALJ determined that the plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 22). The ALJ summarized plaintiff's testimony, noting "mixed signals" and changes from hearing to hearing. (R. 23). The ALJ then summarized the medical evidence, noting that plaintiff first sought treatment on October 24, 2014, and that treatment was conservative. Plaintiff did not comply with her physical

therapy regimen. Exam results could be characterized as mostly normal. Deficits were not significant, and studies showed problems to be mild or at most moderate. (R. 23-26). The ALJ concluded her discussion by linking the various medical findings to her residual functional capacity finding. (R. 26).

As for medical opinions, the ALJ found the statement from plaintiff's treating physician "not entirely work preclusive" aside from the doctor's statement that plaintiff could only sit or stand two hours each in a day. But the ALJ found this assessment was unsupported by the medical record and, so, gave the statement "some weight, but not controlling weight." (R. 26). The ALJ then noted that the medical expert who testified at the first hearing did not have an opportunity to review all the medical evidence. Accordingly, she gave greater weight to the medical expert who testified at the second hearing, Dr. Goldstein, a neurologist who reviewed the entire file. (R. 27). The ALJ noted that Dr. Goldstein thought there was no support for plaintiff's claimed limitations due to her hand and headaches, which was similar to what her treating physician thought. Dr. Goldstein observed that claimant had small fiber neuropathy, and was receiving treatment for her other issues, but thought that plaintiff's headaches and hand arthritis were not severe. He did not think her small fiber neuropathy would affect her motor functioning, but did not "see any apparent distress with regard to her mental status." Still, the doctor felt there were some limitations supported by the totality of the medical evidence: the use of a cane, handling and fingering, and hazards limitations. The ALJ gave the greatest weight to Dr. Goldstein's assessment because he was a specialist and reviewed "a significant amount of the record." (R. 27).

Concluding her findings, the ALJ relied on the testimony of the vocational expert that plaintiff remained capable of performing her past relevant work as a "supervisor of way" and

executive secretary at the Chicago Transit Authority. Accordingly, the ALJ found the plaintiff not disabled under the Act and not entitled to benefits. (R. 27-28).

## II.

If the ALJ's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. *See* 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole, *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019), but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997); *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017)

The substantial evidence standard is a low hurdle to negotiate, *Biestek*, 139 S. Ct. at 1154, but, in the Seventh Circuit, the ALJ also has an obligation to build an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Under the "logical bridge" standard, even if

11

the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build a "logical bridge." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.").[2] Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of rushing water that can only be traversed by an engineering marvel like the Mackinac bridge. Another might see a shallow creek they can hop across on a rock or two.

At the same time, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).[3]

---

[2] In contexts other than Social Security cases, the Seventh Circuit has held that affirmance can be based on "any basis appearing in the record...." *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties, ... No matter, because we may affirm on any basis that appears in the record.").

[3] Prior to *Sarchet*'s "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that the ALJ had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted," but only "a minimal level of articulation of the ALJ's assessment of the evidence ... in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985),
(continued...)

**III.**

The plaintiff argues that the ALJ committed the following reversible errors: (1) she failed to support her finding that plaintiff did not have a severe medically determinable impairment prior to October 27, 2014; (2) she improperly omitted any accommodation for attention or concentration deficits in her RFC finding; and (3) she failed to fully accommodate plaintiff's upper and lower extremity limitations in her RFC assessment. [Dkt. #17, at 7].

**A.**

First, the plaintiff contends that the ALJ erred in finding that plaintiff had no medically determinable impairment, or no severe impairment, prior to October 27, 2014. But, contentions or claims alone will not do it. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability ...."); 20 C.F.R. §§ 404.1529(a);

---

³(...continued)
the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

> We do not have the fetish about findings that [the plaintiff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).
>
> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do.... This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

766 F.2d at 287 (citations omitted).

13

416,929(a) ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled."). The plaintiff "bears the burden to prove she is disabled by producing medical evidence." *Gedatus v. Saul*, 994 F.3d 893, 905 (7th Cir. 2021); *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021)(plaintiff must "identify[] . . . objective evidence in the record" that she is disabled); *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010). And, obviously, she bears the burden of proving she has a severe impairment at Step 2. *Gedatus*, 994 F.3d at 898; *Krell v. Saul*, 931 F.3d 582, 584 (7th Cir. 2019). That means an impairment that "significantly limits the [plaintiff's] ability to perform basic work activities. *Peeters v. Saul*, 975 F.3d 639, 641 (7th Cir. 2020 ); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).[4]

According to the plaintiff's brief, there is no medical evidence – of anything, treatment or impairments – prior to October 27, 2014. [Dkt. #17, at 2]. Actually, there *is* some medical evidence relevant to the period plaintiff is complaining about. The plaintiff had sinusitis or rhinitis in 2011. (R. 563). That's certainly not a severe impairment and certainly not disabling. She mentioned migraines but never had a severe one (R. 563), so contrary to plaintiff's rather exaggerated take, it is not "untenable" that her migraines were not severe. [Dkt. #17, at 10]. In addition, there was

---

[4] This requirement, in effect, matches the basic proposition appearing throughout the law that "unfortunately... saying so doesn't make it so...." *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010). *Accord Madlock v. WEC Energy Group, Inc.*, 885 F.3d 465, 473 (7th Cir. 2018); *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 770 (7th Cir. 2020)("Notably absent from these allegations, however, is any proposed proof that state actors, not municipal actors, were engaged in this *de facto* discrimination."); *Donald J. Trump for President, Inc. v. Secy of Pennsylvania*, 830 F. Appx 377, 381 (3d Cir. 2020)("But calling an election unfair does not make it so. Charges require specific allegations and then proof. We have neither here."). Even the Solicitor General's unsupported assertions are not enough. *Digital Realty Trust, Inc. v. Somers*, _U.S._, 138 S.Ct. 767, 779 (2018); *Bowers v. Dart*, 1 F.4th 513, 520 (7th Cir. 2021)("With all of this evidence in mind, we share the district court's conclusion that a rational juror could doubt that Bowers was telling the truth by insisting he could not walk."). *Cf. Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)(Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

nothing wrong with any of her extremities. (R. 565). That's all the evidence in the record — evidence the plaintiff doesn't even bother to cite to – as to plaintiff's condition before October 27, 2014. Where, exactly, in that evidence does the plaintiff think a severe impairment is established? The plaintiff does not say.

The next time plaintiff sought treatment for anything was October 27, 2014, when she pulled her knee climbing stairs. She had no other discomfort. (R. 566). Affect was normal, there were no signs of depression, but she was noted to be anxious. (R. 566, 567). Neurological signs were normal. (R. 566, 567). Despite her injury, she had full range of motion in both knees and exam was normal aside from some tenderness in the right lateral hamstring tendon. (R. 567). So, at that point, all that was wrong with plaintiff was a pulled knee and perhaps some anxiety. Again, there is nothing in the medical evidence that establishes – as it is the plaintiff's burden to do – that, before October 27, 2014, she had an impairment that significantly limited her ability to perform basic work activities. *Peeters*, 975 F.3d at 641;*Moore*, 743 F.3d at 1121. As the Commissioner's brief aptly put it, "[it is not the ALJ's job to identify evidence showing that a condition was not present. It is plaintiff's burden to identify evidence showing the condition was present." [Dkt. # 23, at 5].

**B.**

Next, the plaintiff argues that the ALJ erred when she failed to accommodate any attention or concentration deficits in her RFC finding. Essentially, the plaintiff wanted the ALJ to credit Dr. Glynn's opinion that Plaintiff's pain "or other symptoms" are severe enough to constantly interfere with the attention and concentration needed to perform even simple tasks. [Dkt. #17, at 11]; (R. 1273-1276). The only pain Dr. Glynn reported in answer to plaintiff's counsel's question. "[i]f your patient has pain, characterized the nature, location, frequency, precipitating factors, severity" was

15

pain in plaintiff's knee. (R. 1273). The pain was brought on by "movement" – as opposed to sitting as in a sedentary occupation – and improved with rest. (R. 1273). Dr. Glynn did say plaintiff's pain would "constantly" interfere with concentration (R. 1274). But, as detailed earlier, many of the treatment notes indicated that she was experiencing no pain, and none of the treatment notes included any report of pain so severe that it might interfere with concentration. Plaintiff testified she had no trouble concentrating to read (R. 64), or to drive (R. 121). Exam results were almost always normal in terms of strength, sensation, reflexes, and coordination. The severity of migraines was never noted, other than to say they were long-standing and controlled with medication. Plaintiff testified that she got them no more than once or twice a month. (R. 122). There was, in short, never a single indication that they were severe enough or frequent enough to interfere with concentration at work. So, it's unclear where Dr. Glynn got that from. *See, e.g., Pavlicek v. Saul*, 994 F.3d 777, 781 (7th Cir. 2021)(treating physician's opinion not entitled to weight when inconsistent with his own treatment notes); *Schmidt v. Astrue*, 496 F.3d 833, 842–43 (7th Cir. 2007)(same).

Simply put, without any medical evidence to document any concentration issues, it was entirely appropriate for the ALJ not to include any such limitations in her RFC finding. An RFC finding need only incorporate those limitations that are supported by medical evidence. *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021); *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019); *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019). And, in this case, there is no medical evidence to support limitations in concentration.

Indeed, it must be said that plaintiff's brief tends to grasp at straws to find support for ongoing limitations in concentration. At one point, plaintiff even submits that she had limitations in concentration as a result of lethargy, mental fog, and word finding difficulties as a result of her

16

"toxic slew of impairments." [Dkt. #17, at 12]. But, that's a rather dramatic mischaracterization of the evidence, hopefully an unintentional one. The record shows that this was a limited circumstance brought on by dehydration due to food poisoning, that it was treated, and resolved. So, on this isolated occasion, the "toxic slew" was no more than something plaintiff ate. Plaintiff's assertions that her depression limited her concentration are similarly without any support in the record. On most occasions, plaintiff either denied any such symptoms or depression was noted to be under control. Her own doctor said she had no limitations that might stem from any psychological impairments. (R. 1275). *See Gedatus*, 994 F.3d at 905 ("[Plaintiff] has not pointed to any medical opinion or evidence to show any . . . specific limitations."). As such, there is no evidence that plaintiff requires any accommodations due to any issues with concentration. *See Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019)(plaintiff failed to establish what kind of work restrictions might address alleged limitations in concentration, persistence, or pace).

## C.

Finally, plaintiff contends that the ALJ also erred by failing to include any upper extremity limitations in her RFC finding. Again, it must be remembered that it is the plaintiff's burden to support any such limitations with medical evidence. The evidence to which plaintiff directs the court does not demonstrate that the ALJ's finding that plaintiff was limited to frequent manipulation; meaning up to two-thirds of the workday was not supported by substantial evidence. X-rays showed arthritis in her right hand – her dominant hand – was minimal. She was fitted with a thumb splint and was given a cortisone shot in her left hand. Nevertheless, there is no record of ongoing limitations greater than those found by the ALJ. Indeed, plaintiff's treating doctor said she had *no* limitations in using her hands. (R. 1276).

Again, it is up to the plaintiff to point to medical evidence that shows she cannot perform her past sedentary work. *Gedatus*, 994 F.3d at 905; *Karr*, 989 F.3d at 513; *Castile*, 617 F.3d at 927. And, more specifically, the plaintiff is also responsible for directing the court to evidence that shows her limitations are greater than those found by the ALJ. *Jozefyk*, 923 F.3d at 498; *Morrison v. Saul*, 806 F. App'x 469, 474 (7th Cir. 2020)(plaintiff must cite evidence to support "any additional restrictions that [s]he believes should have been included in the RFC."). She has not done so in this case.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgement [Dkt. # 17] is denied, and the defendant's motion for summary judgment [Dkt. #22] is granted.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 3/8/22

18